UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.                                    CRIMINAL NO. 3:21-cr-187 (OAW)

NATWEST MARKETS PLC

## PLEA AGREEMENT

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") and the Defendant, NatWest Markets Plc (the "Defendant"), by and through its undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant's Board of Directors, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  The terms and conditions of this Agreement are as follows:

## The Defendant's Agreement

1.      Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to waive any right it may have to grand jury indictment and its right to challenge venue in the United States District Court for the District of Connecticut, and to plead guilty to a two-count criminal Information charging the Defendant, in Count One, with wire fraud in violation of 18 U.S.C. § 1343 and, in Count Two, with securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff.  The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Fraud Section and the Office in their investigation into the conduct described in this Agreement and other conduct related to fraudulent trading involving securities issued by the United States Department of the Treasury ("U.S. Treasury Securities") and derivatives on those securities,

including futures contracts ("U.S. Treasury futures contracts"), as described in the Statement of Facts attached to this Agreement as Attachment A.

2.  The Defendant understands that, to be guilty of wire fraud in violation of 18 U.S.C. § 1343, the following essential elements must be satisfied:

a.  There was a scheme or artifice to defraud or to obtain money and property by materially false and fraudulent pretenses, representations, or promises;

b.  The Defendant knowingly participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud; and

c.  In execution of that scheme, the Defendant used or caused the use of interstate wires.

To be guilty of securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff, the following essential elements must be satisfied:

a.  the Defendant employed a device, scheme, or artifice to defraud, made an untrue statement of material fact, or engaged in an act, practice, or course of business that operated as a fraud or deceit upon a purchaser or seller;

b.  the Defendant did so in connection with the purchase or sale of securities;

c.  the Defendant made use of or caused the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in furtherance of the fraudulent scheme; and

d.  the Defendant acted willfully, knowingly, and with the intent to defraud.

3.  The Defendant understands and agrees that this Agreement is between the Fraud Section and the Office and the Defendant and does not bind any other component of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority.  Nevertheless, the Fraud Section and the Office will bring this Agreement and the nature

- 2 -

and quality of the conduct, cooperation and remediation of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, if requested by the Defendant.

4.     The Defendant agrees that this Agreement will be executed by an authorized corporate representative.  The Defendant further agrees that a resolution duly adopted by the Defendant's Board of Directors in the form attached to this Agreement as Attachment B, authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Board of Directors, on behalf of the Defendant.

5.     The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

6.     The Fraud Section and the Office enter into this Agreement based on the individual facts and circumstances presented by this case and the Defendant, including:

a.     the 2018 scheme described in the Statement of Facts constituted a material breach of the October 25, 2017 Non-Prosecution Agreement between the Office and the Defendant's U.S. broker-dealer subsidiary, NatWest Markets Securities Inc. ("NWMSI"), and occurred while the Defendant was on probation following its May 20, 2015 guilty plea and January 5, 2017 sentencing for conspiring to manipulate the foreign currency exchange market;

b.     the nature and seriousness of the offense conduct, which involved fraudulent schemes to manipulate the markets for U.S. Treasury Securities and U.S. Treasury futures contracts during different time periods by different employees, and resulted in losses of approximately $6,761,967 to other market participants, as described in the Statement of Facts;

c.    the Defendant has a substantial prior criminal history of similar conduct in the securities and commodities markets, including,

(i)    a February 5, 2013 deferred prosecution agreement for criminal violations in connection with manipulation of the benchmark London Interbank Offered Rate from 2006 to 2010 (and a related guilty plea to wire fraud by the Defendant's Japanese subsidiary);

(ii)    a May 20, 2015 guilty plea by the Defendant to conspiracy to manipulate the foreign currency exchange ("FX") market from December 2007 to at least April 2010; and

(iii)    an October 25, 2017 non-prosecution agreement entered into by the Defendant's U.S. broker-dealer subsidiary, NWMSI, regarding fraudulent misrepresentations in the purchase and sale of collateralized loan obligations and residential mortgage-backed securities transactions from 2008 to 2013;

d.    the Defendant also has a substantial prior history of other criminal conduct and civil and regulatory actions against it, including,

(i)    a February 3, 2017 settlement with the Commodity Futures Trading Commission, which the Defendant entered without admitting or denying the underlying conduct, relating to the Defendant's attempted manipulation of the ISDAFIX benchmark between 2007 and 2012;

(ii)    an August 14, 2018 civil settlement between the Defendant's parent company and the United States Attorney's Office for the District of Massachusetts resolving an investigation into alleged misrepresentations by the Defendant's U.S. affiliates in underwriting and issuing residential mortgage-backed securities between 2005 and 2008; and

(iii)    an October 7, 2021 guilty plea in the United Kingdom by National Westminster Bank Plc, a U.K. commercial bank affiliate of the Defendant, for violating U.K. Money Laundering Regulations 2007 concerning ongoing monitoring, risk-sensitive ongoing monitoring, and enhanced ongoing monitoring between 2012 and 2016;

e.    the Defendant did not receive voluntary disclosure credit because it did not voluntarily and timely disclose to the Fraud Section and the Office the criminal conduct described in the Statement of Facts, although the Defendant did report the 2018 scheme to the Fraud Section and the Office pursuant to NWMSI's reporting obligations stemming from its October 25, 2017 Non-Prosecution Agreement and the Defendant's May 20, 2015 guilty plea;

f.    the Defendant received credit for cooperation under U.S.S.G. § 8C2.5(g)(2) because it timely provided to the Fraud Section and the Office all relevant facts known to it, including information about the individuals involved in the conduct described in the attached Statement of Facts; in addition, the Defendant received partial credit under the Fraud Section's Corporate Enforcement Policy because of the nature and extent of its cooperation, including producing documents from foreign countries in ways that did not implicate foreign data privacy law prohibitions, proactively identifying for the Fraud Section and the Office important documents and information even when those documents and information were not favorable to the Defendant, making factual presentations to the Fraud Section and the Office, making an employee available for interview, and collecting, analyzing, and organizing voluminous evidence and information for production to the Fraud Section and the Office; however, the Defendant was not able to provide the Fraud Section and the Office with certain securities trading data relevant to the 2008–2014

scheme described in the Statement of Facts because that data was no longer available to the Defendant, and the time required for the Defendant to retrieve and restore commodities trading data from the same period meaningfully slowed down the Fraud Section's and the Office's investigation;

g.      the Defendant has made a number of improvements to its compliance program and internal controls since the 2008-2014 misconduct, including expanding automated trade surveillance, implementing a new Market Abuse Policy and Statement of Conduct, and completing a remediation plan in connection with its FX guilty plea, and engaged in remedial measures following the 2018 scheme, including promptly investigating a counterparty complaint, remediating technical and training issues that contributed to a delay by surveillance personnel in escalating the trading activity at issue in the 2018 scheme, immediately suspending (and later terminating for cause) two employees, and separating from a supervisor;

h.      the Defendant had an inadequate and ineffective compliance program and internal controls as they related to prevention and prompt detection of fraudulent trade practices, such as spoofing, during the period of the conduct described in the attached Statement of Facts;

i.      the Defendant has enhanced and has committed to continuing to enhance its compliance program and internal controls, ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement, including by voluntarily retaining an outside compliance consultant to support this work;

j.      based on the state of the Defendant's compliance program and the progress of its remediation, including the fact that certain of the Defendant's remedial improvements to its compliance program and internal controls have not been fully implemented or tested

to demonstrate that they would prevent and detect similar misconduct in the future, the Fraud Section and the Office determined that an independent compliance monitor was necessary as set forth in Attachment D to this Agreement (Independent Compliance Monitor);

       k.     accordingly, after considering (a) through (j) above, the Fraud Section and the Office determined that the starting point for determining the Defendant's fine amount should be the midpoint of the applicable U.S. Sentencing Guidelines range, but that the Defendant should receive an aggregate discount of 20 percent from the otherwise-applicable fine amount;

       l.     based on the Defendant's criminal, civil, and regulatory history and the state of its compliance program, the Fraud Section and the Office determined that an independent compliance monitor was necessary; and

       m.     the Defendant has agreed to continue to cooperate with the Fraud Section and the Office as described in Paragraph 10 below.

7.     The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

       a.     to plead guilty as set forth in this Agreement;

       b.     to abide by all sentencing stipulations contained in this Agreement;

       c.     to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

       d.     to commit no further crimes;

       e.     to be truthful at all times with the Court;

       f.     to pay the applicable fine and special assessment;

g.      to continue to implement a compliance and ethics program designed to prevent and detect violations of U.S. federal law throughout its operations, including but not be limited to the minimum elements set forth in Attachment C of this Agreement; and

h.      to retain an independent compliance monitor in accordance with Attachment D of this Agreement.

8.      The Defendant's obligations under the Agreement shall last and be effective from the date that this Agreement is signed until three years after the date on which the independent compliance monitor (the "Monitor") is retained by the Company, as provided in Paragraphs 23–27 below (the "Term").  The Defendant agrees, however, that in the event the Fraud Section and the Office determine, in their exclusive discretion, that the Defendant has knowingly violated any provision of this Agreement or failed to completely perform or fulfill each of the Defendant's obligations under this Agreement, the Fraud Section and the Office, in their exclusive discretion, may impose an extension or extensions of the Term for up to a total additional time period of one year, without prejudice to the Fraud Section's and the Office's right to proceed as provided in Paragraphs 28–31 below.  Any extension of the Term under this Paragraph extends all terms of this Agreement, including the terms of the monitorship described in Attachment D, for an equivalent period.

9.      Except as may otherwise be agreed in writing by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the Term, the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers operations related to Defendant's securities and commodities business that are material to the Defendant's consolidated operations, or to the operations of any U.S. subsidiary or affiliate involved in the conduct described in Attachment A, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall

include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Fraud Section and the Office's ability to breach under this Agreement is applicable in full force to that entity. The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant shall provide notice to the Fraud Section and the Office at least 30 days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Fraud Section and the Office shall notify the Defendant prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If, at any time during the Term, the Defendant engages in a transaction that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, either the Fraud Section or the Office may deem it a breach of this Agreement pursuant to Paragraphs 28–31. Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section and the Office in their exclusive discretion.

10.     The Defendant shall cooperate fully with the Fraud Section and the Office in any and all matters under investigation begun during the Term by the Fraud Section, the Office, or any other component of the Department of Justice until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or three years from the date this Agreement is signed ("Cooperation Period"). At the request of the Fraud Section or the Office during the Cooperation Period, the Defendant shall also cooperate fully with other domestic

or foreign law enforcement and regulatory authorities and agencies in any investigation of the Defendant, its parent company, its affiliates, any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters. The Defendant's cooperation pursuant to this Paragraph is subject to applicable law and regulations, including data privacy and national security laws, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant must timely provide to the Fraud Section and the Office a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Defendant bears the burden of establishing the validity of any such an assertion. The Defendant agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.      The Defendant shall timely and truthfully disclose all factual information with respect to its activities, those of its parents, subsidiaries, and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence, any allegations, or any internal or external investigations, about which the Defendant has any knowledge or, with respect to information within the custody or control of the Defendant, about which the Fraud Section or the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Fraud Section and the Office any document, record, or other tangible evidence which the Fraud Section or the Office may request.

b.      Upon request of the Fraud Section or the Office, the Defendant shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section and the Office the information and materials described above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

     c.     The Defendant must use its best efforts to make available for interviews or testimony, as requested by the Fraud Section or the Office, present or former officers, directors, employees, agents and consultants of the Defendant.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

     d.     With respect to any information, testimony, documents, records, or other tangible evidence provided to the Fraud Section and the Office pursuant to this Agreement, the Defendant consents to any and all disclosures to other governmental authorities including United States authorities and those of a foreign government of such materials at the sole discretion of each of the Fraud Section or the Office.

11.     During the Cooperation Period should the Defendant learn of any evidence or allegation of a criminal violation of U.S. federal law, the Defendant shall promptly report such evidence or allegation to the Fraud Section and the Office.  Annually during the Term and any additional period of the Cooperation Period that is longer than the Term, and 30 days after the Cooperation Period expires, the Defendant's Chief Executive Officer and Chief Financial Officer will certify, in the form of executing the document attached as Attachment E to this Agreement, to the Fraud Section and the Office that the Defendant has met its reporting obligations pursuant to this Paragraph.  Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and will be deemed to have been made in the District of Connecticut.

12.     The Defendant agrees that any fine imposed by the Court will be due and payable in full within ten business days of the entry of judgment, that any restitution imposed by the Court will be due and payable in accordance with the Court's order, and the Defendant will not attempt to avoid or delay payment.  The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the District of Connecticut the mandatory special assessment of $400 per count on the date of sentencing.

## The United States' Agreement

13.     In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Fraud Section and the Office agree not to file additional criminal charges against the Defendant or any of its direct or indirect parents, affiliates, subsidiaries, or joint ventures relating to (a) any of the conduct described in Attachment A, or (b) information made known to the Fraud Section and the Office prior to the date of this Agreement. This Paragraph does not provide any protection against prosecution for any crimes, including market manipulation, made in the future by the Defendant or by any of its officers, directors, employees, agents or consultants, whether or not disclosed by the Defendant pursuant to the terms of this Agreement.  This Agreement does not close or preclude the investigation or prosecution of any natural persons, including any officers, directors, employees, or agents of the Defendant, or any officers, directors, employees, or agents of the Defendant's direct or indirect affiliates, subsidiaries, or joint ventures, for any matter whatsoever.  The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's excise and income tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

## Factual Basis

14.     The Defendant is pleading guilty because it is guilty of the charges contained in the Information.  The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and Attachment A are true and correct, that it is responsible for the acts of its officers, employees, and agents described in the Information and Attachment A, and that the Information and Attachment A accurately reflect the Defendant's criminal conduct.

## The Defendant's Waiver of Rights, Including the Right to Appeal

15.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings if the guilty plea is later withdrawn.  The Defendant expressly warrants that it has discussed these rules with its counsel and understands them.  Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.  Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Fraud Section and the Office have fulfilled all of their obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

16.     The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance.  The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as provided in this Agreement.  The Defendant understands that the rights of criminal defendants include the following:

    a.      the right to plead not guilty and to persist in that plea;

    b.      the right to a jury trial;

c.     the right to be represented by counsel—and, if necessary, have the court appoint counsel—at trial and at every other stage of the proceedings;

d.     the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

e.     pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

Nonetheless, the Defendant knowingly waives these rights and the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum described below (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742 or on any ground whatsoever (except those specifically excluded in this Paragraph) in exchange for the concessions made by the United States in this Agreement. This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b). The Defendant also knowingly waives the right to bring any collateral challenge attacking either the conviction or the sentence imposed in this case. The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in Attachment A or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the Defendant's conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later

withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Fraud Section and the Office are free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

## Penalty

17. The statutory maximum sentence that the Court can impose under Count One for a violation of 18 U.S.C. § 1343 is a fine of $1,000,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense (which is, in total, $12,331,826), whichever is greatest, 18 U.S.C. § 3571(c)(1)-(2), (d); five years' probation, 18 U.S.C. § 3561(c)(1); and a mandatory special assessment of $400, 18 U.S.C. § 3013(a)(2)(B). The statutory maximum sentence that the Court can impose under Count Two for a violation of 15 U.S.C. §§ 78j(b) & 78ff is a fine of $25,000,000, 18 U.S.C. § 3571(c)(1); five years' probation, 18 U.S.C. § 3561(c)(1); and a mandatory special assessment of $400, 18 U.S.C. § 3013(a)(2)(B).

## Sentencing Recommendation

18. The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines. The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a). The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof. The

Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 17.

19.    The Fraud Section and the Office and the Defendant agree that a faithful application of the United States Sentencing Guidelines (U.S.S.G.) to determine the applicable fine range yields the following analysis:

a.    The 2018 U.S.S.G. are applicable to this matter.

b.    <u>Offense Level</u>.  Based upon U.S.S.G. § 2B1.1, the total offense level is 29, calculated as follows:

| | | |
|---|---|---|
| (a)(1) | Base Offense Level | 7 |
| (b)(1) | Loss of More than $3,500,000 | +18 |
| (b)(2)(A)(i) | Ten or More Victims | +2 |
| (b)(10) | Sophisticated Means / Substantial Part of Scheme Committed from Outside the United States | +2 |
| **TOTAL** | | 29 |

c.    <u>Base Fine</u>.  Based upon U.S.S.G. § 8C2.4(d), the base fine is $15,000,000

d.    <u>Culpability Score</u>.  Based upon U.S.S.G. § 8C2.5, the culpability score is 7, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(4) | The unit of the organization within which the offense was committed had 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense | +2 |
| (c)(2) | Offense committed less than five years after a criminal adjudication based on similar misconduct | +2 |
| (g)(2) | The organization clearly demonstrated recognition and affirmative acceptance of responsibility for its | |

| criminal conduct | -2 |
|---|---|
| **TOTAL** | 7 |

e.    <u>Calculation of Fine Range</u>.

| Base Fine | $15,000,000 |
|---|---|
| Multipliers | 1.40 (min)/<br>2.80 (max) |
| Fine Range | $21,000,000 (min)/<br>$42,000,000 (max) |

20.    Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Fraud Section and the Office and the Defendant agree that the following represents the appropriate disposition of the case:

a.    <u>Disposition</u>.  Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the Defendant agree to recommend jointly that the Court impose a sentence requiring the Defendant to pay a criminal fine of $25,200,000 ($12,331,826 on Count One and $12,868,174 on Count Two), payable in full within ten business days of the entry of judgment, and criminal forfeiture of $2,841,368 ($2,245,314 on Count One and $596,054 on Count Two), payable in full to the United States Treasury at the time of the entry of judgment (pursuant to the proposed Preliminary Forfeiture Order attached as Attachment F).  The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to any amounts that Defendant pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in Attachment A.  The Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of its $25,200,000 fine or $2,841,368 in criminal forfeiture.  The Fraud Section and the Office believes that a disposition that includes a fine of $25,200,000 and criminal

forfeiture of $2,841,368 is appropriate based on the factors outlined in Paragraph 6 of the Agreement and those in 18 U.S.C. § 3553(a).

      b.   <u>Restitution</u>.  The Defendant further agrees to pay restitution in an amount not less than $6,761,967 in order to compensate affected market participants for their losses.  The parties agree to jointly recommend, pursuant to Title 18, United States Code, Section 3771(d)(2), that the Court find that the number of victims in this matter is so large as to make individual victim notification impracticable, and instead to permit the Fraud Section and the Office to use alternative victim notification procedures that include the publication of a Department of Justice website that provides information and instructions on the submission of a victim impact statement and restitution claim.  In the event that any market participant to which the Defendant owes restitution is no longer in existence, cannot be located, or fails to submit a restitution claim, and no successor or assign is located, or the Defendant's payment is otherwise refused, the Defendant shall not retain such funds but shall pay them to the Crime Victims Fund.

      c.   <u>Mandatory Special Assessment</u>.  The Defendant shall pay to the Clerk of the Court for the United States District Court for the District of Connecticut on the day of sentencing the mandatory special assessment of $400 per count.

      d.   <u>Probation</u>. The Fraud Section, the Office, and the Defendant agree that a term of organizational probation for a period of three years shall be imposed on the Defendant pursuant to Title 18, United States Code, Sections 3551(c)(1) and 3561(c)(1). The parties agree, pursuant to U.S.S.G. § 8D1.4, that the term of probation shall include as conditions the obligations set forth in Paragraphs 7 and 10 above as well as the payments of the fine and criminal forfeiture amounts set forth in Paragraph 20(a).

- 18 -

21.     This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated.  The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

22.     The Fraud Section, the Office, and the Defendant agree, subject to the Court's approval, to waive the requirement for a Presentence Investigation Report ("PSR"), pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A), based on a finding by the Court that the record contains information sufficient to enable the Court to meaningfully exercise its sentencing authority and to seek sentencing by the Court immediately following the Rule 11 plea hearing. However, the parties agree that in the event the Court orders that the entry of the guilty plea and sentencing occur at separate proceedings, such an order will not affect the Agreement set forth herein. The Defendant understands that the decision whether to proceed with the sentencing proceeding without a PSR is exclusively that of the Court. Additionally, if the Court directs the preparation of a PSR, the Fraud Section and the Office will fully inform the preparer of the PSR and the Court of the facts and law related to the Defendant's case.  At the time of the plea hearing, the parties will suggest mutually agreeable and convenient dates for the sentencing hearing with adequate time for (a) any objections to the PSR, and (b) consideration by the Court of the PSR and the parties' sentencing submissions.

**Independent Compliance Monitor**

23.     Promptly after the Fraud Section and the Office's selection pursuant to Paragraph 25 below, the Defendant agrees to retain a Monitor.  The Monitor's duties and authority, and the obligations of the Defendant with respect to the Monitor and the Fraud Section and the Office, are set forth in Attachment D, which is incorporated by reference into this Agreement.  Within 30 business days after the date of execution of this Agreement, the Defendant shall submit a written proposal identifying the monitor candidates, and, at a minimum, providing the following:

a.     a description of each candidate's qualifications and credentials in support of the evaluative considerations and factors listed below;

b.     a written certification by the Defendant that it will not employ or be affiliated with the Monitor for a period of not less than two years from the date of the termination of the monitorship;

c.     a written certification by each of the candidates that he/she is not a current or recent (i.e., within the prior two years) employee, agent, or representative of the Defendant and holds no interest in, and has no relationship with, the Defendant, its subsidiaries, affiliates, or related entities, or its employees, officers, or directors;

d.     a written certification by each of the candidates that he/she has notified any clients that the candidate represents in a matter involving the Fraud Section or the Office (or any other Department component) handling the monitor selection process, and that the candidate has either obtained a waiver from those clients or has withdrawn as counsel in the other matter(s); and

e.     a statement identifying the monitor candidate that is the Defendant's first, second, and third choice to serve as the Monitor.

24.    The monitor candidates or their team members shall have, at a minimum, the following qualifications:

a.    demonstrated expertise with respect to the securities and commodities laws;

b.    experience designing and/or reviewing corporate compliance policies, procedures, and internal controls, including detective controls such as trade surveillance and electronic communication surveillance;

c.    the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in this Agreement; and

d.    sufficient independence from the Defendant to ensure effective and impartial performance of the Monitor's duties as described in this Agreement.

25.    The Fraud Section and the Office retain the right, in their exclusive discretion, to choose the Monitor from among the candidates proposed by the Defendant, though the Defendant may express its preference(s) among the candidates.  Monitor selections shall be made in keeping with the Department's commitment to diversity and inclusion.  If the Fraud Section and the Office determine, in their exclusive discretion, that any of the candidates are not, in fact, qualified to serve as the Monitor, or if the Fraud Section and the Office, in their exclusive discretion, is not satisfied with the candidates proposed, the Fraud Section and the Office reserves the right to request that the Defendant nominate additional candidates.  In the event the Fraud Section and the Office rejects any proposed Monitors, the Defendant shall propose additional candidates within 20 business days after receiving notice of the rejection so that three qualified candidates are proposed.  This process shall continue until a Monitor acceptable to both parties is chosen.  The Fraud Section and the Office and the Defendant will use their best efforts to complete the selection process within 60 calendar days of the execution of this Agreement.  If the Monitor resigns or is otherwise unable to fulfill his or her obligations as set out herein and in Attachment D, the Defendant shall within 20

business days recommend a pool of three qualified Monitor candidates from which the Fraud Section and the Office will choose a replacement.

26.    The Monitor's term shall be three years from the date on which the Monitor is retained by the Defendant, subject to extension as provided in Paragraph 8.  Conversely, in the event that the Fraud Section and the Office find, in their exclusive discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship in Attachment D, and that the other provisions of this Agreement have been satisfied, the monitorship may be terminated early.

27.    The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term or its early termination, are set forth in Attachment D.  The Defendant agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires.  Nor will the Defendant discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation for a period of two years after the Monitor's term.

**<u>Breach of Agreement</u>**

28.    If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraphs 10 and 11 of this Agreement; (d) fails to implement a compliance program as set forth Attachment C; or (e) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Fraud Section and the Office becomes aware of such a breach after the Cooperation Period has expired, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office has knowledge, which may be pursued by the Office in

the U.S. District Court for the Connecticut or any other appropriate venue.  Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Fraud Section and the Office's exclusive discretion.  Any such prosecution may be premised on information provided by the Defendant.  Any such prosecution relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Cooperation Period plus one year.  Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Cooperation Period plus one year.  The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement.  In addition, the Defendant agrees that the statute of limitations as to any criminal violation of U.S. federal law that occurs during the Cooperation Period will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office are made aware of the violation or the duration of the Cooperation Period plus five years, and that this tolling period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

29.     In the event the Fraud Section and the Office determine that the Defendant has breached this Agreement, the Fraud Section and the Office agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within 30 days of receipt of such notice, the Defendant shall have the opportunity to respond to

the Fraud Section and the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Fraud Section and the Office shall consider in determining whether to pursue prosecution of the Defendant.

30.     In the event that the Fraud Section and the Office determines that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Fraud Section or to the Office or to the Court, including the attached Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section or the Office against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of each of the Fraud Section or the Office.  Defendant expressly reserves and does not waive any rights under the double jeopardy clause of the Fifth Amendment to the United States Constitution.

31.     The Defendant acknowledges that the Fraud Section and the Office have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and is subsequently prosecuted for any crime.  The

Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Public Statements by the Defendant

32.    The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and Attachment A. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraphs 28–31 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Information or Attachment A will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the exclusive discretion of the Fraud Section and the Office. The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and Attachment A provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or Attachment A. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

33.    The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Fraud Section and the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to

matters between the Fraud Section and the Office and the Defendant; and (b) whether the Fraud Section and the Office has any objection to the release or statement.

## Complete Agreement

34.     This document states the full extent of the Agreement between the parties.  There are no other promises or agreements, express or implied.  Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR NATWEST MARKET PLC]:**

Date: December 21, 2021                    By:

                                               James M. Esposito
                                               General Counsel of NatWest Markets Plc

Date: December 21, 2021                    By:

                                               Boyd Johnson
                                               Theresa Titolo
                                               Wilmer Cutler Pickering Hale and Dorr LLP
                                               Outside counsel for NatWest Markets Plc

**FOR THE DEPARTMENT OF JUSTICE:**

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

JONATHAN N. FRANCIS
ASSISTANT U.S. ATTORNEY

JOSEPH BEEMSTERBOER
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

AVI PERRY
ACTING DEPUTY CHIEF, FRAUD
    SECTION
ELISE KENT BERNANKE
TRIAL ATTORNEY

- 26 -

## ATTACHMENT A

## STATEMENT OF FACTS

1.     The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") and NatWest Markets Plc ("NatWest" or the "Defendant"), and the parties hereby agree and stipulate that the following information is true and accurate.  NatWest admits, accepts, and acknowledges that it is responsible for the acts of its officers, employees, and agents as set forth below.  Had this matter proceeded to trial, NatWest acknowledges that the Fraud Section and the Office would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information:

### NatWest

2.     At all relevant times, NatWest (formerly known as The Royal Bank of Scotland plc) was a global banking and financial services company that was headquartered in London, England.  NatWest was a subsidiary and the international investment banking arm of NatWest Group plc (formerly known as The Royal Bank of Scotland Group plc), which was a banking holding company based in Edinburgh, Scotland.  NatWest also maintained a branch in Singapore.

3.     NatWest had a subsidiary, NatWest Markets Securities Inc. ("NWMSI," formerly RBS Securities Inc.), which was a registered U.S. broker-dealer based in Stamford, Connecticut.  NMWSI entered into a Non-Prosecution Agreement with the Office on October 25, 2017.  Under the terms of that Non-Prosecution Agreement, NWMSI agreed that, among other things, it and its parents, subsidiaries, and corporate affiliates would not commit any federal felony or violate the

anti-fraud provisions of the securities law for one year and it would comply with certain reporting obligations.

4.      NatWest was a financial institution within the definition of Title 18, United States Code, Section 20.

U.S. Treasuries

5.      At all relevant times, to raise capital to operate the federal government and finance the national debt, the United States Department of the Treasury issued and sold marketable securities in the form of bills, notes, bonds, and certain related instruments at public auction (collectively, "U.S. Treasury Securities"). U.S. Treasury Securities were subject to fixed terms at fixed interest rates determined by the prevailing rates in the marketplace at the time of issuance. After U.S. Treasury Securities were auctioned, institutional and individual investors could buy and sell these securities over-the-counter in the secondary (or "cash") market on a number of trading platforms.

6.      Investors also could trade derivatives that tracked the prices of U.S. Treasury Securities. These derivatives included futures contracts that were standardized agreements for the purchase and sale of U.S. Treasury Securities for future delivery, including futures contracts for the 5-year U.S. Treasury note, 10-year U.S. Treasury note, and 30-year U.S. Treasury bond, as well the Ultra U.S. Treasury bond futures contract (the "Ultrabond") (all four futures contracts, collectively, "U.S. Treasury futures contracts," and together with U.S. Treasury Securities, "U.S. Treasuries"). U.S. Treasury futures contracts were commodities that traded on markets designated and regulated by the United States Commodity Futures Trading Commission, including the Chicago Board of Trade ("CBOT"), which was an exchange operated by the CME Group, Inc. ("CME").

<u>The Schemes to Defraud</u>

7.    Between approximately January 2008 and May 2014, a NatWest trader in London ("Trader-1") and a trader employed by NatWest's U.S. broker-dealer in Stamford ("Trader-2") independently engaged in schemes to defraud in connection with the placement of U.S. Treasury futures contracts on CBOT.

8.    Separately, for approximately three months in 2018, two traders employed at NatWest's branch in Singapore ("Trader-3" and "Trader-4") engaged in a scheme to defraud in connection with the purchase and sale of U.S. Treasury Securities in the cash market.

9.    In furtherance of these schemes to defraud and as described below, Trader-1, Trader-2, Trader-3, and Trader-4 (collectively, the "Subject NatWest Traders") knowingly, willfully, and with the intent to defraud placed orders to buy and sell certain U.S. Treasuries with the intent to cancel those orders before execution ("Spoof Orders"), including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for U.S. Treasuries.

10.    More specifically, on hundreds of occasions, the Subject NatWest Traders placed one or more orders for U.S. Treasuries that they intended to execute ("Genuine Orders"). Sometimes, but not always, the Genuine Orders were "iceberg" orders, so that other market participants could see only a portion of the order's full size at any given time. An "iceberg" order was a type of order that a trader could place on certain trading platforms and exchanges that did not display the order's full size to other market participants. Only a pre-set portion of an iceberg order was visible at any given time. When the visible portion was filled, the next pre-set portion of the order became visible, and so forth.

11.    During the same trading sequences, the Subject NatWest Traders also placed one or more Spoof Orders on the opposite side of the market from the Genuine Orders.  The Spoof Orders were not iceberg orders, and so the full order size was visible to other market participants.

12.    By placing Spoof Orders, the Subject NatWest Traders intended to inject materially false and misleading information about the genuine supply and demand for U.S. Treasuries into the markets, and to deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.

13.    This materially false and misleading information was intended to, and at times did, trick other market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling U.S. Treasuries at quantities, prices, and times that they otherwise likely would not have traded.

14.    By placing Spoof Orders to *buy* U.S. Treasuries, Subject NatWest Traders intended to create the false and misleading impression in the market of increased demand in an effort to drive *up* the prices of U.S. Treasuries.

15.    By placing Spoof Orders to *sell* U.S. Treasuries, the Subject NatWest Traders intended to create the false and misleading impression in the market of increased supply in an effort to drive *down* the prices of U.S. Treasuries.

16.    In either situation, the Subject NatWest Traders placed Spoof Orders with the intent to move the price of U.S. Treasuries fraudulently and artificially in a manner that would increase the likelihood that one or more of their own Genuine Orders on the opposite side of the market would be filled by other market participants, allowing the Subject NatWest Traders to generate trading profits and avoid losses for themselves and, ultimately, NatWest.

17.    Once the Subject NatWest Traders successfully used their Spoof Orders to get their Genuine Orders filled (either in whole or in part), they attempted to, and generally did, quickly cancel their Spoof Orders before they could be executed.

18.    In most instances, the Subject NatWest Traders placed both their Spoof Orders and their Genuine Orders in either the cash market or the futures market.  In some instances, however, at least one of the Subject NatWest Traders—namely, Trader-2—took advantage of the close correlation between U.S. Treasury Securities and U.S. Treasury futures contracts to engage in cross-market manipulation by placing Spoof Orders in the futures market and Genuine Orders in the cash market.

19.    The Spoof Orders placed by the Subject NatWest Traders exposed NatWest to (a) new and increased risks of loss, including in the form of: (i) fees, costs, and expenses incurred through investigations, litigation, and proceedings arising from the underlying conduct; (ii) losses associated with the financial risk that the Spoof Orders would be executed (despite the traders' intent to cancel the Spoof Orders before execution); and (iii) reputational harm; and (b) actual loss, including fees, costs, and expenses actually incurred through investigations, litigation, and proceedings arising from the underlying conduct.

20.    The Spoof Orders placed by the Subject NatWest Traders were transmitted electronically via international and interstate wire communications from NatWest's offices in Connecticut, London, and Singapore to computer servers operated by various over-the-counter trading platforms in New Jersey and elsewhere and to computer servers operated by the CME in Illinois.

21.     In placing the Spoof Orders, the Subject NatWest Traders were acting within the scope of their employment as employees and agents of NatWest, including its U.S. broker-dealer, and with the intent, at least in part, to benefit NatWest.

### Examples of Unlawful Trading in Furtherance of the Schemes to Defraud

22.     One example of unlawful trading by the Subject NatWest Traders in the futures market occurred on June 24, 2013, at 3:45:13.965 a.m.,[1] when Trader-1, who was in London, placed an iceberg Genuine Order to buy 100 10-year U.S. Treasury note futures contracts at $125.40625, displaying two contracts to the market.  Next, 10.156 seconds later, Trader-1 placed a Spoof Order to sell 1,000 10-year U.S. Treasury note futures contracts at $125.421875 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower.  Then, 25 milliseconds later, Trader-1's Genuine Order to buy was filled in its entirety.  Last, 3.663 seconds later, Trader-1 cancelled his Spoof Order in its entirety.

23.     Trader-1 sometimes referenced his deceptive trading practices in electronic chats with colleagues at NatWest, especially when his Spoof Orders were filled by other market participants despite his intentions and before he could cancel them.  For instance, in a chat on June 13, 2011, he explained to a colleague that, in order to execute a Genuine Order to sell, he had placed a buy order (a "bid") into the market. The colleague asked, "why you try and bid? to spoof?" Trader-1 answered: "y[es] . . . i was doing lot of that last week & was saying myself, gonna get caught soon, should stop."  In a chat two weeks later, on June 29, 2011, Trader-1 mentioned to the same colleague that he had been "cauight spoofing few times," and in a chat on August 15, 2012, he complained that he had "dropped little $ alraedy this am spoofing."

---

[1] All dates, times, and numbers in this Statement of Facts are approximate. Unless otherwise specified, all times are in Central Standard Time or Central Daylight Time.

A-6

24.     Another example of unlawful trading by the Subject NatWest Traders in the futures market occurred on July 25, 2012, at 10:05:01.416 a.m., when Trader-2, who was in Stamford, placed a Genuine Order to buy 10 Ultrabond futures contracts at $175.90625.  Next, 158.716 seconds later (*i.e.*, nearly 3 minutes), Trader-2 placed a Spoof Order to sell 500 Ultrabond futures contracts at $175.93750 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower.  Then, 24 milliseconds later, Trader-2's Genuine Order to buy was filled in its entirety.  Last, 858 milliseconds later, Trader-2 canceled his Spoof Order in its entirety.

25.     An example of Trader-2's cross-market manipulation occurred on May 14, 2014, at 12:33:44.593 p.m., when he placed a Spoof Order to buy 210 Ultrabond futures contracts at $149.59375, with the intent to create the illusion of demand in the futures market, deceive other market participants, and artificially move the correlated cash market price higher.  Trader-2 canceled the Spoof Order in its entirety 3.131 seconds later.  In the interim, in the cash market, Trader-2 filled Genuine Orders to sell a total of 2,000,000 30-year U.S. Treasury bonds.

26.     An example of unlawful trading by the Subject NatWest Traders in the cash market occurred on July 2, 2018, at 5:28:48.789 a.m. Coordinated Universal Time, when Trader-3, who was in Singapore, placed Genuine Orders to sell a total of 50,000 10-year U.S. Treasury notes at $100.234375.  Next, 799.767 seconds later (*i.e.*, over 13 minutes), Trader-3 willfully placed Spoof Orders to buy a total of 500,000 10-year U.S. Treasury notes at $100.21875 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher.  Then, one and two milliseconds later, his Genuine Orders to sell were filled in their entirety.  Last, 2.627 seconds later, Trader-3 canceled his Spoof Orders in their entirety.

27.     In addition to the four Subject NatWest Traders, each of whom placed Spoof Orders on numerous occasions, a supervisor in Stamford ("Supervisor-1") placed orders on three occasions in 2018 that had the potential to distort the U.S. Treasury Securities cash market.

Reaction of Supervisor-1 and Supervisor-2 to Exposure of the Scheme to Defraud

28.     On July 26, 2018, a market participant complained to NatWest about trading activity in the cash market during Asia trading hours.   In response, NatWest immediately commenced an internal review, which led to the suspension and ultimate termination of both of the Singapore-based traders, Trader-3 and Trader-4.

29.     On July 26, 2018, Supervisor-1 called Trader-3 and described the complaint in the following terms:

> The basic complaint . . . is they're trying to run a business that's based on real market signals . . . and you're giving them fake market signals.  We could debate whether what you are doing is fair or not fair . . . .  In a Darwinian sense I don't have any issue with it . . . but the fact is they do provide liquidity to . . . to the global business . . . and if they cut us off because of your activity . . . then I do have a problem with it. . . .  [S]omeone who really wants to see you out of a job could make a strong argument of spoofing and then we go down the path of the nature of spoofing and whether you have a job after it as well.

30.     Later in that call, Supervisor-1 advised Trader-3 on how to hide his fraudulent scheme from NatWest compliance personnel:

> [S]end an e-mail to [Supervisor-1's supervisor ("Supervisor-2")], me, [and another trader]. . . . Just email the three of us and say you and I spoke and you know just that the trading behavior, just don't go into details, just say your trading style is gonna be adjusted to, put something in the e-mail that . . . makes it clear to all three of us, without saying anything that is going to make . . . some surveillance person say "hey I wanna get involved in what they're talking about." Just say, "[Supervisor-1] and I spoke about best practices and you know we're all good going forward," or something like that.  You know what I mean like just, just you could even make it say, "[Supervisor-1] and I spoke last night and we are all set going forward," right, just put something in writing that says I got the

> message.  Relay this to [Trader-4] . . .  and we're all set and I think
> I'll get you turned on you know in a few days.

31.    Supervisor-1 was employed by NWMSI.  Under the terms of its Non-Prosecution Agreement, NWMSI was required to report any illegal conduct by its employees or the employees of its parents, subsidiaries, and corporate affiliates that came to the attention of its compliance personnel.  If Supervisor-1's attempt to hide the Singapore-based traders' fraudulent scheme from NWMSI's and NatWest's compliance department had been successful, it also could have concealed that criminal conduct from law enforcement.

32.    On July 28, 2018, in an email to Trader-4, Supervisor-1 agreed that "things have gotten blown out of proportion."

33.    On July 30, 2018, during a department call, Supervisor-2 addressed the market participant's complaint and the Singapore-based traders' suspension:

> [W]e've had enough playbook training here as well as globally for people to know what the rules and regulations are.  Whether you agree with them or not is irrelevant.  Cause I actually don't agree with some of them . . . .
>
> \*        \*        \*
>
> I think the rules have changed as well, which is, you know, whatever, unfortunate in my opinion.

34.    On November 26, 2019, NatWest separated from Supervisor-1 as a result of the July 26, 2018 call.

<u>Losses Caused by the Schemes to Defraud</u>

35.    In total, NatWest's schemes to defraud described above resulted in losses of approximately $6,761,967 to other U.S. Treasuries market participants, specifically, $6,165,913 in losses to U.S. Treasury futures contracts market participants and $596,054 in losses to U.S.

Treasuries Securities market participants, corresponding to unlawful profits to NatWest of approximately $2,841,368.

## ATTACHMENT B

## CERTIFICATE OF CORPORATE RESOLUTIONS

EXTRACT DRAFT MINUTES of Meeting of the Board of Directors of NATWEST
MARKETS PLC (the "Bank") held by video conference at 6.30pm on 16 December 2021.

### US Treasury ("UST") Trading Update

It was agreed that for the purpose of this item that the Minutes would be construed accordingly.

After due discussion the Directors:

(a) On the basis of the advice received from NatWest's in-house Legal department and
WilmerHale, APPROVED, in principle, the Bank entering a guilty plea subject to resolving
the outstanding negotiations discussed at the meeting;

(b) RESOLVED THAT the Chief Executive or the General Counsel is hereby authorized to
finalise the negotiation of, and approve the final forms of, the Plea Agreement;

(c) RESOLVED THAT NatWest Market Plc accept the terms and conditions of the DOJ Plea
Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial
pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States
code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing
waiver for purposes of the DOJ Plea Agreement and any charges by the United States
arising out of the conduct described in the Statement of Facts attached to the DOJ Plea
Agreement of any objection with respect to venue and consents to the filing of the
Information as provided under the terms of the DOJ Plea Agreement, in the United States
District Court for the District of Connecticut; and (c) a knowing waiver of any defenses
based on the statute of limitations for any prosecution relating to the conduct described in
the Statement of Facts attached to the DOJ Plea Agreement or relating to conduct known to
the Fraud Section and the Office prior to the date on which the DOJ Plea Agreement was
signed that is not time-barred by the applicable statute of limitations on the date of the
signing of the DOJ Plea Agreement;

(d) RESOLVED THAT the General Counsel of NatWest Markets Plc, James M. Esposito, is
hereby authorized, empowered and directed, on behalf of NatWest Markets Plc, to execute
the DOJ Plea Agreement substantially in such form as reviewed by this Board of Directors
at this meeting with such changes as the Chief Executive Officer, Robert Begbie or the
General Counsel, James M. Esposito may approve;

(e) RESOLVED THAT the General Counsel of NatWest Markets Plc, James M. Esposito, is
hereby authorized, empowered and directed to take any and all actions as may be necessary
or appropriate and to approve the forms, terms or provisions of any agreement or other
documents as may be necessary or appropriate, to carry out and effectuate the purpose and
intent of the foregoing resolutions; and

(f) RESOLVED THAT all of the actions of the General Counsel of NatWest Markets Plc,
James M. Esposito, which actions would have been authorized by the foregoing resolutions
except that such actions were taken prior to the adoption of such resolutions, are hereby

severally ratified, confirmed, approved, and adopted as actions on behalf of NatWest Markets Plc.

I confirm that the above resolutions were passed at the Bank Board meeting on 16 December 2021.

...........................................................................
Scott Gibson
Chief Governance Officer and Corporate Secretary

## ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, trading surveillance protocols, compliance code, policies, and procedures relating to conduct in its securities and commodities trading businesses in violation of (i) the anti-fraud, anti-spoofing, and/or anti-manipulation provisions of the Commodity Exchange Act, Title 7, United States Code, Sections 1, *et seq.*; (ii) Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5; (iii) as it relates to securities and commodities trading, Title 18, United States Code, Section 1343; and (iv) the securities and commodities fraud statute, Title 18, United States Code, Section 1348 (collectively (i), (ii), (iii), and (iv), the "Securities and Commodities Laws"), NatWest Markets Plc (the "Defendant"), on behalf of itself and its subsidiaries agrees to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, surveillance protocols, compliance code, policies, and procedures.

Where necessary and appropriate, the Defendant agrees to adopt new, or to modify its existing, compliance programs, including internal controls, surveillance protocols, compliance policies, and procedures in order to ensure that it maintains an effective compliance program that is designed to effectively prevent and detect violations of the Securities and Commodities Laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Defendant's existing internal controls, compliance code, policies, and procedures:

## Commitment to Compliance

1.      The Defendant will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the Securities and Commodities Laws and its compliance codes, and demonstrate rigorous adherence by example.  The Defendant also will ensure that middle management, in turn, reinforce those standards and encourage employees to abide by them.  The Defendant will create and foster a culture of ethics and compliance with the law in its day-to-day operations at all levels of the company.

## Policies and Procedures

2.      The Defendant will develop and promulgate a clearly articulated and visible corporate policy against violations of the Securities and Commodities Laws, which policy shall be memorialized in a written compliance code or codes.

3.      The Defendant will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the Securities and Commodities Laws and the Defendant's compliance code, and the Defendant will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the Securities and Commodities Laws by personnel at all levels of the Defendant.  These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Defendant shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Defendant.

C-2

Periodic Risk-Based Review

4.    The Defendant will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Defendant.

5.    The Defendant shall review its compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving industry standards.

Proper Oversight and Independence

6.    The Defendant will assign responsibility to one or more senior corporate executives of the Defendant for the implementation and oversight of the Defendant's compliance code, policies, and procedures regarding the Securities and Commodities Laws.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Defendant's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

Training and Guidance

7.    The Defendant will implement mechanisms designed to ensure that its compliance code, policies, and procedures regarding the Securities and Commodities Laws are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, all securities and commodities traders, any positions that require such training (*e.g.*, internal audit, sales, legal, compliance, finance), and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, securities and commodities traders, agents

C-3

and business partners, certifying compliance with the training requirements. The Defendant will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

8.      The Defendant will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, securities and commodities traders, and, where necessary and appropriate, agents and business partners, on complying with the Defendant's compliance code, policies, and procedures regarding the Securities and Commodities Laws, including when they need advice on an urgent basis.

<u>Internal Reporting and Investigation</u>

9.      The Defendant will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the Securities and Commodities Laws or the Defendant's compliance code, policies, and procedures regarding the Securities and Commodities Laws.

10.      The Defendant will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the Securities and Commodities Laws or the Defendant's compliance code, policies, and procedures regarding the Securities and Commodities Laws. The Defendant will handle the investigations of such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

<u>Enforcement and Discipline</u>

11.     The Defendant will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures regarding the Securities and Commodities Laws, including appropriately incentivizing compliance and disciplining violations.

12.     The Defendant will institute appropriate disciplinary procedures to address, among other things, violations of the Securities and Commodities Laws and the Defendant's compliance code, policies, and procedures regarding the Securities and Commodities Laws by the Defendant's directors, officers, and employees.  Such procedures should be applied consistently, fairly and in a manner commensurate with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee.  The Defendant shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall compliance program regarding the Securities and Commodities Laws is effective.

<u>Mergers and Acquisitions</u>

13.     The Defendant will develop and implement policies and procedures for mergers and acquisitions requiring that the Defendant conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding the Securities and Commodities Laws by legal, accounting, and compliance personnel.

14.     The Defendant will ensure that the Defendant's compliance code, policies, and procedures regarding the Securities and Commodities Laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Defendant and will promptly (a) train the

directors, officers, employees, securities and commodities traders, agents, and business partners consistent with Paragraphs 7–8 above on the Securities and Commodities Laws and the Defendant's compliance code, policies, and procedures; and (b) where warranted, conduct an audit of all newly acquired or merged businesses as quickly as is practicable concerning compliance with the Securities and Commodities Laws.

Monitoring, Testing, and Remediation

15.     In order to ensure that its compliance program does not become stale, the Defendant will conduct periodic reviews and testing of its compliance codes, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of the Securities and Commodities Laws and the Defendant's codes, policies, and procedures regarding the Securities and Commodities Laws, taking into account relevant developments in the field and evolving industry standards.  The Defendant will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.  Based on such review and testing and its analysis of any prior misconduct, the Defendant will conduct a thoughtful root cause analysis and timely and appropriately remediate to address the root causes.

16.     The Defendant will maintain, or where necessary establish, effective trade surveillance protocols and systems capable of detecting trading activity that has indicia of fraudulent, manipulative, or otherwise unlawful conduct, and commit the necessary resources, including trained compliance and control personnel, to investigate and appropriately disposition any such trading that is identified.

## ATTACHMENT D

## <u>INDEPENDENT COMPLIANCE MONITOR</u>

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of NatWest Markets Plc (the "Defendant"), on behalf of itself and its direct and indirect U.S. subsidiaries, with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office"), are as described below:

1.      The Defendant will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless the early termination provision of Paragraph 26 of the Plea Agreement (the "Agreement") is triggered.

Monitor's Mandate

2.      The Monitor's primary responsibility is to assess and monitor the Defendant's compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, so as to specifically address and reduce the risk of any recurrence of the Defendant's misconduct.  During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal controls, trading surveillance protocols, compliance policies, and procedures as they relate to the Defendant's current and ongoing compliance with the following statutes and their implementing rules and regulations insofar as they relate to fraudulent, manipulative, and disruptive trading practices, namely (i) the Commodity Exchange Act, Title 7, United States Code, Sections 1, *et seq.*; (ii) Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5; (iii) Title 18, United States Code, Section 1343; and (iv) Title 18, United States Code, Section 1348 (collectively (i), (ii), (iii), and (iv) the "Securities and Commodities Laws"), and take such reasonable steps as, in his or her

view, may be necessary to fulfill the foregoing mandate (the "Mandate").  This Mandate shall include an assessment of the Board of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program described in Attachment C of the Agreement.

Defendant's Obligations

3.      The Defendant shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Defendant's compliance program in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations.  To that end, the Defendant shall: facilitate the Monitor's access to the Defendant's documents and resources; not limit such access, except as provided in Paragraphs 5–6; and provide guidance on applicable local law (such as relevant data protection and labor laws).  The Defendant shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement.  The Defendant shall use its best efforts to provide the Monitor with access to the Defendant's former employees and its third-party vendors, agents, and consultants.

4.      Any disclosure by the Defendant to the Monitor concerning potential violations of the Securities and Commodities Laws shall not relieve the Defendant of any otherwise applicable obligation to truthfully disclose such matters to the Fraud Section and the Office, pursuant to the Agreement.

D-2

Withholding Access

5.      The parties agree that no attorney-client relationship shall be formed between the Defendant and the Monitor.  In the event that the Defendant seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Defendant that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Defendant reasonably believes production would otherwise be inconsistent with applicable law, the Defendant shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.      If the matter cannot be resolved, at the request of the Monitor, the Defendant shall promptly provide written notice to the Monitor, the Fraud Section, and the Office.  Such notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Fraud Section and the Office may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

Monitor's Coordination with the
Defendant and Review Methodology

7.      In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Defendant's personnel, including in-house counsel, compliance personnel, internal auditors, and outside consultants, on an ongoing basis.  The Monitor may rely on the product of the Defendant's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Defendant, as well as the Defendant's internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Defendant-specific expertise, provided that the Monitor has confidence in the quality of those resources.  In this regard,

the Monitor may consider the work completed by Defendant with an outside consultant in connection with the remediation plan related to its FX guilty plea, as well as ongoing work with the outside compliance consultant voluntarily engaged by Defendant.

8.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets.  In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) the particular markets in which the Defendant trades; (b) the types of financial products and services, including the particular securities and commodities, traded by the company; (c) the status and strength of the Defendant's detective controls, including but not limited to, the Defendant's trade surveillance and electronic communications surveillance systems; (d) the number, type, and frequency of surveillance alerts that have been triggered by an individual trader or by multiple traders on a particular trading desk and how the Defendant has handled those alerts; and (e) the sufficiency of the personnel and resources within the compliance function.

9.      In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including the Defendant's current policies and procedures; (b) on-site observation of selected systems and procedures of the Defendant at sample sites, including trade surveillance, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Defendant's compliance program.

Monitor's Written Work Plans

10.     To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial ("first') review and prepare a first report, followed by at least two follow-up reviews and reports as described in Paragraphs 16–19 below.  With respect to the first report, after consultation with the Defendant, the Fraud Section, and the Office, the Monitor shall prepare the first written work plan within 60 calendar days of being retained, and the Defendant, the Fraud Section, and the Office shall provide comments within 30 calendar days after receipt of the written work plan.  With respect to each follow-up report, after consultation with the Defendant, the Fraud Section, and the Office, the Monitor shall prepare a written work plan at least 30 calendar days prior to commencing a review, and the Defendant, the Fraud Section, and the Office shall provide comments within 20 calendar days after receipt of the written work plan.  Any disputes between the Defendant and the Monitor with respect to any written work plan shall be decided by the Fraud Section and the Office in their exclusive discretion.

11.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the first review shall include such steps as are reasonably necessary to conduct an effective first review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations of the Securities and Commodities Laws that may have occurred before the date of the Agreement.  In developing such understanding, the Monitor is to rely, to the extent possible, on available information and documents provided by the Defendant.  It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

<u>First Review</u>

12.    The first review shall commence no later than 120 calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Defendant, the Monitor, the Fraud Section, and the Office).  The Monitor shall issue a written report within 150 calendar days of commencing the first review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Defendant's program for ensuring compliance with the Securities and Commodities Laws.  The Monitor should consult with the Defendant concerning his or her findings and recommendations on an ongoing basis and should consider the Defendant's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Defendant prior to finalizing them.  The Monitor's reports need not recite or describe comprehensively the Defendant's history or compliance policies, procedures, and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention.  The Monitor shall provide the report to the Board of Directors of the Defendant and contemporaneously transmit copies to:

Chief – MIMF Unit, Fraud Section
Chief – CECP Unit, Fraud Section
Criminal Division, U.S. Department of Justice
1400 New York Avenue N.W.
Bond Building, Third Floor
Washington, D.C. 20005

and

Jonathan Francis
Assistant United States Attorney
U.S. Attorney's Office for the District of Connecticut
Connecticut Financial Center
157 Church Street, 25th Floor

New Haven, CT 06510
jonathan.francis@usdoj.gov

After consultation with the Defendant, the Monitor may extend the time period for issuance of the first report for a brief period of time with prior written approval of the Fraud Section and the Office.

13.    Within 150 calendar days after receiving the Monitor's first report, the Defendant shall adopt and implement all recommendations in the report, unless, within 60 calendar days of receiving the report, the Defendant notifies in writing the Monitor, the Fraud Section, and the Office of any recommendations that the Defendant considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Defendant need not adopt that recommendation within the 150 calendar days of receiving the report but shall propose in writing to the Monitor, the Fraud Section, and the Office an alternative policy, procedure or system designed to achieve the same objective or purpose.  As to any recommendation on which the Defendant and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within 45 calendar days after the Defendant serves the written notice.

14.    In the event the Defendant and the Monitor are unable to agree on an acceptable alternative proposal, the Defendant shall promptly consult with the Fraud Section and the Office. The Fraud Section and the Office may consider the Monitor's recommendation and the Defendant's reasons for not adopting the recommendation in determining whether the Defendant has fully complied with its obligations under the Agreement.  Pending such determination, the Defendant shall not be required to implement any contested recommendation(s).

15.    With respect to any recommendation that the Monitor determines cannot reasonably be implemented within 150 calendar days after receiving the report, the Monitor may

extend the time period for implementation with prior written approval of the Fraud Section and the Office.

Follow-Up Reviews

16.     A follow-up ("second") review shall commence no later than 180 calendar days after the issuance of the first report (unless otherwise agreed by the Defendant, the Monitor, the Fraud Section, and the Office).  The Monitor shall issue a written second report within 120 calendar days of commencing the second review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the first review.  After consultation with the Defendant, the Monitor may extend the time period for issuance of the second report for a brief period of time with prior written approval of the Fraud Section and the Office.

17.     Within 120 calendar days after receiving the Monitor's second report, the Defendant shall adopt and implement all recommendations in the report, unless, within 30 calendar days after receiving the report, the Defendant notifies in writing the Monitor, the Fraud Section, and the Office concerning any recommendations that the Defendant considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Defendant need not adopt that recommendation within the 120 calendar days of receiving the report but shall propose in writing to the Monitor, the Fraud Section, and the Office an alternative policy, procedure, or system designed to achieve the same objective or purpose.  As to any recommendation on which the Defendant and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within 30 calendar days after the Defendant serves the written notice.

18.     In the event the Defendant and the Monitor are unable to agree on an acceptable alternative proposal, the Defendant shall promptly consult with the Fraud Section and the Office. The Fraud Section and the Office may consider the Monitor's recommendation and the Defendant's reasons for not adopting the recommendation in determining whether the Defendant has fully complied with its obligations under the Agreement. Pending such determination, the Defendant shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Monitor determines cannot reasonably be implemented within 120 calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section and the Office.

19.     The Monitor shall undertake a second follow-up ("third") review not later than 150 calendar days after the issuance of the second report. The Monitor shall issue a third report within 120 calendar days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16–18. Following the third review, the Monitor shall certify whether the Defendant's compliance program, including its policies and procedures, is reasonably designed and implemented to prevent and detect violations of the Securities and Commodities Laws. The final review and report shall be completed and delivered to the Fraud Section and the Office no later than 30 calendar days before the end of the Term.

<u>Monitor's Discovery of Potential or Actual Misconduct</u>

20.     (a)     Except as set forth below in sub-paragraphs (b), (c), and (d), should the Monitor discover during the course of his or her engagement that any director, officer, employee, agent, third-party vendor, or consultant of the Defendant may have engaged in unlawful activity in violation of the Securities and Commodities Laws ("Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Defendant's General Counsel, Chief

Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the Fraud Section and the Office at any time, and shall report Potential Misconduct to the Fraud Section and the Office upon request.

(b)     In some instances, the Monitor should immediately report Potential Misconduct directly to the Fraud Section and the Office and not to the Defendant. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Fraud Section and the Office and not to the Defendant, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Defendant; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)     If the Monitor believes that any Potential Misconduct has occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Fraud Section and the Office. When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Fraud Section and the Office, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Defendant should occur as the Fraud Section and the Office and the Monitor deem appropriate under the circumstances.

(d)     The Monitor shall address in his or her reports the appropriateness of the Defendant's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Fraud Section and the Office or not. Further, if the Defendant or any entity or person working directly or indirectly for or on behalf of the Defendant withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Fraud

Section and the Office and address the Defendant's failure to disclose the necessary information in his or her reports.

(e)    The Defendant nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

<u>Meetings During Pendency of Monitorship</u>

21.    The Monitor shall meet with the Fraud Section and the Office within 30 calendar days after providing each report to the Fraud Section and the Office to discuss the report, to be followed by a meeting between the Fraud Section, the Office, the Monitor, and the Defendant.

22.    At least annually, and more frequently if appropriate, representatives from the Defendant, the Fraud Section, and the Office will meet together to discuss the monitorship and any suggestions, comments, or improvements the Defendant may wish to discuss with or propose to the Fraud Section and the Office, including with respect to the scope or costs of the monitorship.

<u>Contemplated Confidentiality of Monitor's Reports</u>

23.    The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section and the Office determine in their exclusive discretion that disclosure would be in furtherance of the Fraud Section's and the Office's discharge of their duties and responsibilities or is otherwise required by law.

## ATTACHMENT E

## REPORTING CERTIFICATION

To: United States Department of Justice          United States Attorney's Office
Criminal Division, Fraud Section                District of Connecticut
Attn: Joseph S. Beemsterboer, Acting Chief      Attn: Leonard C Boyle, Acting U.S. Attorney

Re: Plea Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 10 of the Plea Agreement ("Agreement") filed on December 21, 2021 in the U.S. District Court for the District of Connecticut, by and between the United States and NatWest Markets Plc (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 11 of the Agreement and that the Company has disclosed to the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") any and all evidence or allegations of conduct required pursuant to Paragraph 11 of the Agreement, which includes evidence or allegations that may constitute a criminal violation of U.S. federal law ("Disclosable Information"). This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes. The undersigned further acknowledge and agree that the reporting requirement contained in Paragraph 11 and the representations contained in this certification constitute a significant and important component of the Agreement and the Fraud Section's and the Office's determination whether the Company has satisfied its obligations under the Agreement.

E-1

The undersigned hereby certify respectively that [he/she] is the Chief Executive Officer of the Company and that [he/she] is the Chief Financial Officer of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the District of Connecticut.  This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the District of Connecticut.

By: _____        Dated: _____
    [NAME]
    Chief Executive Officer
    NatWest Markets Plc

By: _____        Dated: _____
    [NAME]
    Chief Financial Officer
    NatWest Markets Plc

**ATTACHMENT F**

**PROPOSED PRELIMINARY FORFEITURE ORDER**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

        v.                         CRIMINAL NO. 3:21-cr-187 (OAW)

NATWEST MARKETS PLC

     Defendant.

CONSENT PRELIMINARY
ORDER OF FORFEITURE/MONEY JUDGMENT

WHEREAS, on December 21, 2021, NatWest Markets Plc (the "Defendant"), was charged in a two-count Information, [DKT NO.] (the "Information"), with wire fraud, in violation of Title 18, United States Code, Section 1343 ("Count One"), and with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count Two");

WHEREAS, the Information included a forfeiture allegation as to Counts One and Two, seeking forfeiture to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, of any and all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One and Two of the Information, including but not limited to, a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses;

WHEREAS, on December 21, 2021, the Defendant pleaded guilty to Counts One and Two of the Information, pursuant to an agreement (the "Plea Agreement") with the United States

Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the District of Connecticut (collectively, the "Government"), wherein the Defendant (i) admitted that forfeiture applies with respect to Counts One and Two of the Information and agreed to forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, a sum of $2,841,368 in United States currency ($2,245,314 on Count One and $596,054 on Count Two), representing the amount of proceeds traceable to the violations set forth in Counts One and Two of the Information, and (ii) agreed to transfer $2,841,368 in United States currency, plus any associated transfer fees, pursuant to payment instructions provided by the United States (with $1,400,000 of the total amount to be paid into the United States Postal Inspection Service Consumer Fraud Fund) no later than 10 business days after the Defendant's sentencing hearing, in full satisfaction of the forfeiture money judgment;

IT IS HEREBY STIPULATED AND AGREED, by and between the United States of America and the Defendant, both by and through undersigned counsel, that:

1. As a result of the offenses charged in Counts One and Two of the Information, to which the Defendant pleaded guilty, a money judgment in the amount of $2,841,368 in United States currency (the "Money Judgment") shall be entered against the Defendant.

2. Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Consent Preliminary Order of Forfeiture/Money Judgment is final as to the Defendant, upon entry of this Consent Preliminary Order of Forfeiture/Money Judgment, and shall be deemed part of the sentence of the Defendant, and shall be included in the judgment of conviction therewith.

3.  By no later than 10 business days after the date of the Defendant's sentencing hearing, the Defendant shall transfer $2,841,368 in United States currency, plus any associated transfer fees, to the United States by wire transfer to the United States Marshals Service (or its designee) in full satisfaction of the Money Judgment.

4.  Upon execution of this Consent Preliminary Order Forfeiture/Money Judgment, and pursuant to Title 21, United States Code, Section 853, the United States Marshals Service (or its designee), shall be authorized to deposit (i) $1,441,368 of the payment it received on the Money Judgment into the Department of Justice Assets Forfeiture Fund, and (ii) $1,400,000 of the payment it received on the Money Judgement into the United States Postal Inspection Service Consumer Fraud Fund, and the United States shall have clear title to such forfeited property represented in (i) and (ii).

5.  The Court shall retain jurisdiction to enforce this Consent Preliminary Order of Forfeiture/Money Judgment, and to amend it as necessary, pursuant to Rule 32.2(e) of the Federal Rules of Criminal Procedure.

6.  The Clerk of the Court shall forward three certified copies of this Consent Preliminary Order of Forfeiture/Money Judgment to Assistant United States Attorney Jonathan Francis, U.S. Attorney's Office for the District of Connecticut, 157 Church Street, Floor 25, New Haven, CT 06510.

7.  The signature page of this Consent Preliminary Order of Forfeiture/Money Judgment may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. A facsimile or electronic image of the original signature of any party executing this Consent Preliminary Order of

Forfeiture/Money Judgment shall be deemed an original signature and shall constitute an

original as against the party whose signature appears in the facsimile or electronic image.

**AGREED:**

**FOR NATWEST MARKETS PLC:**

Date: December 21, 2021                     By: _____

                                              James M. Esposito
                                              General Counsel of NatWest Markets Plc
                                              NatWest Markets Plc

Date: December 21, 2021                     By: _____

                                              Boyd Johnson
                                              Theresa Titolo
                                              WILMER CUTLER PICKERING HALE
                                              AND DORR LLP

**FOR THE GOVERNMENT:**

                                              JOSEPH S. BEEMSTERBOER
                                              Acting Chief, Fraud Section
                                              Criminal Division
                                              United States Department of Justice

Date: _____                     By: _____

                                              Avi Perry
                                              Acting Deputy Chief

                                              LEONARD C BOYLE
                                              United States Attorney
                                              District of Connecticut

Date: _____                     By: _____

                                              Jonathan N. Francis
                                              Assistant United States Attorney